**MALJACK PRODUCTIONS, INC., an Illinois corporation, and Batjac Productions, Inc., a California corporation, Plaintiffs,**

**v.**

**UAV CORPORATION, a North Carolina corporation, and Mary Beth Peters, Register of Copyrights, Defendants.**

**BATJAC PRODUCTIONS, INC., a California Corporation, Plaintiff,**

**v.**

**GOODTIMES HOME VIDEO CORPORATION, a Delaware corporation, and Mary Beth Peters, Register of Copyrights, Defendants.**

**Nos. CV 96–0749 DDP, CV 96–7416 DDP.**

United States District Court, C.D. California.

May 21, 1997.

David A. Gerber, D. Gerber Law Offices, Oxnard, CA, for Maljack Productions, Inc., Batjac Productions Inc. in No. CV 96–0749.

Dennis G. Martin, William T. Babbitt, Blakely Sokoloff Taylor & Zafman, Los Angeles, CA, for UAV Corp.

Peter Herbert Moses & Singer, New York City, for Batjac Productions Inc. in No. CV 96–7416.

Juan C. Basombrio, Dorsey & Whitney, L.L.P., Costa Mesa, CA, Helene M. Free-

man, Dorsey & Whitney, L.L.P., New York City, for Goodtimes Home Video Corp.

Thomas J. Byrnes, Dept. of Justice, Commercial Litigation Branch, Civ. Div., Washington, DC, for Registrar of Copyrights.

## I. Background

PREGERSON, District Judge.

A. *Procedural Background.*

Plaintiffs Maljack Productions, Inc. ("Maljack") and Batjac Productions, Inc. ("Batjac") (collectively "Plaintiffs") brought suit against defendants UAV Corporation ("UAV") and Goodtimes Home Video Corporation ("Goodtimes") for infringement of Plaintiffs' alleged rights in two versions of the screenplay for the motion picture McClintock! (the "screenplays"). Plaintiffs also brought suit in both cases against Marybeth Peters, Register of Copyrights ("Register"), because of the Register's refusal to register the screenplays for copyright. The Register intervened in both cases. The Court consolidated Plaintiffs' actions against UAV and Goodtimes on January 23, 1997 to determine whether the Register properly refused to issue a certificate of copyright for the screenplays.

On March 24, 1997, the following motions came before the Court: (1) consolidated motions for summary judgment by all parties concerning the propriety of the Register's refusal to register the McClintock! screenplays for copyright and (2) cross-motions for partial summary judgment by UAV and Plaintiffs in civil case number 96-749 seeking a determination of whether UAV infringed Batjac's copyright in a home video version of McClintock!. After reviewing and considering the materials submitted by the parties and hearing oral argument, the Court finds that the Register properly refused to register the McClintock! screenplays and that UAV infringed Batjac's 1993 McClintock! copyright. Therefore, the Court grants summary judgment in favor of all defendants on the issue of registrability of the screenplays and in favor of Plaintiffs on the issue of UAV's liability for copyright infringement.

B. *Historical Background.*

In 1962, James Edward Grant wrote an original screenplay for the motion picture McClintock!. On October 16, 1962, Grant assigned the rights to all versions of the screenplay to Batjac. The two versions of the screenplay at issue in this case are: (1) the version containing revisions through October 9, 1962 and (2) the version containing revisions through November 23, 1962.

In 1963, Batjac produced the motion picture McClintock! from the screenplay. Batjac registered the motion picture for copyright in 1963 but it did not separately register the screenplay or any versions of the screenplay. The copyright was eligible for renewal in 1991, but Batjac failed to renew the copyright for a second term. Accordingly, the initial copyright term expired and the film entered the public domain at the end of 1991.

In 1993, Batjac created a "panned and scanned" version of the McClintock! motion picture for the videocassette and television market. Panning and scanning is the process by which motion pictures are adapted from the wide screen theater format known as "Panavision" to a narrower format capable of fitting on a television screen. The "aspect ratio" of the motion picture (i.e., the ratio of the screen length to the screen height) was 2.35:1. Batjac reduced the aspect ratio of the 1993 version of McClintock! to 1.33:1. In other words, the television version of McClintock! uses only about 56% of each frame from the 1963 picture. In addition to reconciling the aspect ratios, Batjac edited the motion picture's monaural soundtrack by remixing, resequencing, sweetening, equalizing, balancing, and stereoizing it, and also added entirely new sound material.

On February 23, 1993, Batjac transferred exclusive domestic home video rights in the 1993 McClintock! to Maljack for a term of years.

On April 12, 1993, Batjac registered the 1993 McClintock! with the Copyright Office as a "derivative work." The registration certificate lists Batjac as the "copyright claimant." The preexisting material is listed as the "previously published motion picture." The material added to the work is listed as "new editing of visual and sound material (including editing for new visual format, sound remixing, resequencing, sweetening,

equalization, and balancing) and addition of new sound material."

In 1993, UAV began producing and distributing video cassettes of McClintock!. UAV's videocassette version of McClintock! was photographically identical and largely aurally identical to Plaintiffs' 1993 McClintock!. UAV's only change was to replace the original soundtrack music with new music. UAV later created and released its own pan and scan version of the public domain McClintock! and ceased distributing the copy of the 1993 McClintock!.

In March 1996, Batjac attempted to register the McClintock! screenplays for copyright, but the Register refused. The Register rejected Batjac's applications because the screenplays acquired statutory copyright along with the motion picture in 1963 and then entered the public domain along with the motion picture in 1991. Thus, there was nothing left to register for copyright unless Batjac could show that there was new material in the screenplays that had not been incorporated into the motion picture.

## II. Discussion

A. *Standard On Summary Judgment.*

Summary judgment is appropriate when there "is no genuine issue of material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In order to defeat a motion for summary judgment, there must be facts in dispute that are both genuine and material, i.e., there must be facts upon which a fact finder could "reasonably find" for the non-moving party. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The court does not weigh the evidence or make credibility determinations; rather, the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Id.*

The initial burden of establishing that there is no genuine issue of material fact lies with the moving party. Fed.R.Civ.P. 56(c); *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53; *British Airways Board v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Once the movant has met this burden by producing evidence that, if left uncontroverted, would entitle the moving party to a directed verdict at trial, the burden shifts to the non-movant to present specific facts showing that there is a genuine issue of material fact. *See* Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Lake Nacimiento Ranch Co. v. San Luis Obispo,* 841 F.2d 872, 876 (9th Cir.1987), *cert. denied,* 488 U.S. 827, 109 S.Ct. 79, 102 L.Ed.2d 55 (1988).

B. *The Register Properly Refused Batjac's Application to Register the McClintock! Screenplays for Copyright.*

UAV, Goodtimes, the Register, and Plaintiffs all move for summary judgment on the propriety of the Register's refusal to register the two McClintock! screenplays.

The Court holds that the Register properly refused to register the screenplays. The screenplays, to the extent that they were contained in the motion picture, acquired statutory copyright along with the motion picture after the motion picture was published with proper copyright notice in 1963. The screenplays then entered the public domain at the end of 1991 when Batjac failed to renew the copyright.

1. *Copyright law background.*

The copyright for the original McClintock! motion picture was secured under the Copyright Act of 1909, 17 U.S.C. § 1 *et seq.* (repealed effective 1978) ("1909 Act"). Under the 1909 Act, there was a dichotomy between federal and state law. *See* 1 M. Nimmer & D. Nimmer, Nimmer on Copyright § 2.02 (1996) ("Nimmer"). Unpublished works were protected by state common law or statute. *See id.; see also* 17 U.S.C. § 2 ("Nothing in this title shall be construed to annul or limit the right of the author ... of an unpublished work, at common law or in equity, to prevent the copying, publication, or use of such unpublished work without his consent, and to obtain damages therefor."). This protection was "referred to

somewhat inaccurately" as common law copyright. 1 Nimmer § 2.02 at 2–19. Common law protection began upon creation of the work and ended upon publication of the work. After the work was published, the only protection available was statutory copyright. *See id.*

The Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, ("1976 Act") eliminated common law protection. In its place, the 1976 Act imbued all original works with statutory protection.[1] Works created before January 1, 1978 but not copyrighted or in the public domain as of that date lost their common law protection and gained statutory protection as unpublished works. *See* 17 U.S.C. § 303. The statutory protection for works created but unpublished as of January 1, 1978 endures until 50 years after the author's death or until the year 2002, whichever is longer. *Id.* Furthermore, for works created but unpublished as of 1978 that are published before December 31, 2002, the term of copyright extends until at least 2027. *Id.*

Under the 1909 Act, publication of a work with proper notice secured statutory copyright protection. 17 U.S.C. § 10 (repealed effective 1978). Statutory copyright provided authors an initial 28–year term of copyright protection and a 28–year renewal term. 17 U.S.C. § 24 (repealed effective 1978). Prior to the Copyright Renewal Act of 1992, which amended the 1976 Act to provide for automatic renewal, copyright owners had to apply for renewal.[2] The 1976 Act changed the renewal term for works copyrighted under the 1909 Act by affording works in their initial copyright term as of 1978 a renewal term of 47 years. 17 U.S.C. § 304. The 1976 Act gave works already in their renewal term an extra 19 years of protection. 17 U.S.C. § 304. Works that were unpublished as of 1978, such as Plaintiffs allege the McClintock! screenplays to have been, are not entitled to renewal. 17 U.S.C. §§ 302, 303.

Under the 1909 Act, if the initial copyright term expired without renewal, the work entered the public domain. If the copyright was renewed, the work entered the public domain at the conclusion of the renewal term. Alternatively, a copyrighted work entered the public domain if it was published without statutorily correct copyright notice. *See Stewart v. Abend,* 495 U.S. 207, 233, 110 S.Ct. 1750, 1766–67, 109 L.Ed.2d 184 (1990). Under the 1976 Act, a work enters the public domain only if the owner fails to comply with the statutory notice requirements or the cure provisions of section 405(a).

2. *Publication of derivative works.*

A derivative work is a work based on one or more preexisting works.[3] 17 U.S.C. § 101. A motion picture is a derivative work; the motion picture screenplay is one of the preexisting works. Derivative works are copyrightable. 17 U.S.C. § 103.

It is clear that under section 7 of the 1909 Act, publication of a derivative work does not affect the validity of a statutory copyright in the preexisting work even though the preexisting work was incorporated into the derivative work. 17 U.S.C. § 7 (repealed effective 1978); *see Stewart,* 495 U.S. at 230–36, 110 S.Ct. at 1765–68; *see also* 17 U.S.C. § 103(b) (same result under the 1976 Act). Therefore, even if a derivative work enters the public domain, the preexisting work, if copyrighted and published with proper notice, remains copyrighted. *See Russell v. Price,* 612 F.2d 1123 (9th Cir.1979) (holding that the owner of a statutory copyright in a preexisting work can sue for infringement in the event that a public domain derivative work is used without authorization by the owner of the copyright in the preexisting work); *see*

1. Under the 1976 Act, original works are protected upon creation for a term consisting of the life of the author plus 50 years. 17 U.S.C. § 302(a). Once a work is published, the owner of the copyright must comply with the 1976 Act's notice requirements or cure provisions or forfeit copyright protection. *See Harris Custom Builders, Inc. v. Hoffmeyer,* 92 F.3d 517, 520 (7th Cir. 1996).

2. The Copyright Renewal Act applied prospectively and therefore did not automatically renew Batjac's McClintock! copyright.

3. The 1909 Act did not define the term "derivative work." The term was defined by case law until the 1976 Act codified the definition in section 101. *See Stewart,* 495 U.S. at 213 n. 1, 110 S.Ct. at 1756 n. 1.

also *G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469 (2d Cir.1951) (same).

Plaintiffs assert that section 7 of the 1909 Act also protects preexisting works with only common law "copyright." Accordingly, Plaintiffs assert that publication of the McClintock! motion picture could not have been a publication of the screenplays—even only to the extent contained in the motion picture—because if the screenplays were published in 1963, the screenplays entered the public domain in 1991 along with the motion picture, thereby abrogating Plaintiffs' common law rights in the underlying works. Plaintiffs contend that the screenplays retained their common law protection until 1978, when they gained statutory protection under the 1976 Act.

Defendants contend that to the extent the screenplays were incorporated into the film, the 1963 publication of the McClintock! motion picture published the screenplays, thereby investing the published portions of the screenplays with statutory copyright and divesting any common law rights in the works.

a) *Works that would be protected only by virtue of their status as unpublished works are published to the extent that they are incorporated into published derivative works.*

■ In *Classic Film Museum v. Warner Bros., Inc.*, 453 F.Supp. 852 (D.Me.1978), *aff'd*, 597 F.2d 13 (1st Cir.1979), both the district court and the First Circuit Court of Appeals published opinions addressing the identical issue confronting this Court. The district court held, and the court of appeals affirmed, that the expiration of a motion picture copyrighted under the 1909 Act that was caused by non-renewal of the copyright dedicated the entire film to the public and that further exploitation of the film could not be retained by an assertion of common law copyright in the parts of the screenplay that were embodied in the film. Because of its conclusion that the expiration of the statutory copyright in the film placed the entire film into the public domain regardless of any alleged common law rights in any underlying works, the district court expressly declined to consider the effect of section 7 on common law rights or whether the publication of the motion picture constituted a publication of the screenplay. The court of appeals did not make any mention of either issue.

Both courts distinguished the *Ricordi/Russell* line of cases based on the fact that all of those decisions involved underlying works with statutory rather than common law copyrights. Both courts also noted that in the *Ricordi/Russell* line of cases, the underlying copyright would expire at the end of the statutory copyright term, whereas works with asserted common law rights would have perpetual protection so long as they remained unpublished. "To permit this result would frustrate the whole concept of limited monopoly in copyright law." *Classic Film*, 453 F.Supp. at 856; *see Classic Film*, 597 F.2d at 14–15.

The *Classic Film* holding is consistent with the Copyright Office's long-standing position that the portions of a screenplay embodied in a motion picture are published upon publication of the motion picture. *See* U.S. Copyright Office, Compendium of Copyright Offices Practices II at § 910.04 (1984) ("Compendium II").

Nimmer cites *Classic Film* approvingly, stating that the courts reached the proper result even though neither court addressed the publication issue. Nimmer § 4.12[B]. Nimmer concludes, "Because a derivative work by definition to some extent incorporates a copy of the preexisting work, publication of the former necessarily constitutes publication of the copied portion of the latter." *Id.* § 4.12[A] at 4–60 to 4–61.

In a similar case in a different setting, the Seventh Circuit Court of Appeals, reversing the district court, held that under the 1976 Act, the statutory rights of an assertedly unpublished work did not survive entry of the derivative work into the public domain.[4] *See Harris Custom Builders, Inc. v. Hoffmeyer*, 92 F.3d 517, 520 (7th Cir.1996).

4. *Harris* was decided under the 1976 Act. However, the court's analysis is relevant to this Court's analysis (1) by analogy and (2) because Plaintiffs claim that the screenplays are protected under the 1976 Act as "unpublished" works.

Under the 1976 Act, a work remains copyrighted so long as it is unpublished, it is published with notice, or, if it is published without notice, it is registered within five years and subsequently published with notice. 17 U.S.C. § 405. Where the underlying work is copyrighted and published with proper notice, publication of a derivative work does not affect the validity of the copyright in a preexisting work and, therefore, as under the 1909 Act, an underlying work copyrighted under the 1976 Act remains copyrighted even if the derivative work enters the public domain. *See* 17 U.S.C. § 103(b); *Harris,* 92 F.3d at 519.

In *Harris,* the plaintiff owned the copyright for a set of architectural plans. The plaintiff published a brochure advertising a house built from the plans that contained abbreviated drawings based on the plans. The brochure did not contain a copyright notice and was not registered for copyright. Publication of the brochure without copyright notice tentatively put the work into the public domain, and when the plaintiff failed to cure the defect, the work entered the public domain permanently.

When a builder used the drawings in the plaintiff's brochure to build a house, the firm brought suit against the builder, alleging infringement of the underlying copyright in the assertedly unpublished building plans. The plaintiff argued that the underlying plans retained their protection as unpublished works and that only the portion of the derivative brochure separate from the plans entered the public domain. *Id.* at 519–20.

The Court of Appeals for the Seventh Circuit held that the firm could not maintain its infringement action because the plaintiff published the building plans to the extent that the plans were contained in the brochure. Accordingly, the entirety of the brochure entered the public domain when the plaintiff published the brochure without the requisite copyright notice and without curing that deficiency. The court expressly held that " 'publication of a derivative work constitutes a publication of the preexisting work contained therein.' " *Id.* at 520 (quoting Nimmer § 4.12[A] n. 2).

The *Harris* court noted that the result would be different if the underlying work had been separately registered for copyright. In that case, the court stated that under *Stewart,* the failure of the derivative copyright would not affect the underlying copyright. Where, however, the plaintiff claimed copyright based on a work's status as unpublished, the court held that *Stewart* did not apply because the work *had* been published.

The court noted that the result might also be different if a stranger had published the derivative work without permission from the owner of the underlying work. "Congress could not have intended that the various legal consequences of publication ... would be triggered by the unauthorized act of an infringer or other stranger to the copyright." *Id.* at 520–21 (quoting Nimmer § 4.04).[5] Where, however, the owner of the underlying work publishes derivative works, "it can no longer claim a copyright based on their unpublished nature." *Id.* at 521.

Although dicta, the Ninth Circuit Court of Appeals has stated that:

> [The plaintiff] does not argue that the synchronization rights were part of the motion picture copyright, because they would have expired when the motion picture expired. It also does not argue that the synchronization rights existed separately from the motion picture and music copyright; if that were the case, because [the plaintiff] did not copyright the synchronization rights, they would be part of the public domain.

*Maljack v. GoodTimes,* 81 F.3d 881, 885 n. 3 (9th Cir.1996). Accordingly, it appears that the Ninth Circuit, if faced with the issue before the Court, would find that the screenplays were published with the motion picture and entered the public domain with the motion picture.

b) Stewart *only applies to preexisting works that are protected by statute as published works.*

5. In addition, the very definition of a derivative work requires that the author of the derivative work receive consent from the author of the underlying work(s). 17 U.S.C. § 301. Furthermore, under 17 U.S.C. § 401(a), the notice requirement only applies to copies of works published "by authority of the copyright owners." *Harris,* 92 F.3d at 520 (quoting § 401).

Plaintiffs disagree with the *Classic Film* and *Harris* decisions and assert that the Supreme Court's opinion in *Stewart* dictates the opposite result.

In *Stewart,* the author of several short stories owned the statutory copyrights for the works. The author assigned his right to make motion picture versions of one of the stories to a production company. The author also agreed to renew the copyright for the story and to assign the same motion picture rights to the company. In 1953, actor Jimmy Stewart and director Alfred Hitchcock formed a production company that obtained the motion picture rights from the original assignee's successors-in-interest. The author died in 1968 without renewing the copyright, and the right to renew passed to the author's trust, which renewed the copyright at the appropriate time. Because an assignee of renewal rights takes only an expectancy, and because the author died before the copyright was renewed, defendants did not receive the renewal motion picture rights. Accordingly, the plaintiff (the author's trust's assignee) brought a copyright infringement suit against the defendants for distributing the motion picture during the renewal term.

The defendants argued that the right of a copyright owner to prohibit use of the preexisting work is extinguished once the preexisting work is incorporated into the derivative work, assuming that the author of the underlying work agreed to assign his renewal rights to the owner of the derivative work. The Court, however, declined to "read into the Copyright Act a limitation on the statutorily created rights of the owner of [the] underlying work." *Stewart,* 495 U.S. at 216, 110 S.Ct. at 1758.

Section 7 of the 1909 Act states that "the publication of [derivative works] shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works." In *Stewart,* the Supreme Court reached the unsurprising conclusion that section 7 of the 1909 Act meant what it said:

> [P]ublication of the derivative work does not "affect the force or validity of any subsisting copyright upon the matter employed;" publication of the derivative work does not mean that use of the original work in other works is precluded; and publication does not mean that a copyright in the original work shall be secured, e.g., if the work was in the public domain, or extended, as where the original work was copyrighted before the date that the derivative work is copyrighted.

*Id.* at 231, 110 S.Ct. at 1765 (quoting 17 U.S.C. § 7 (repealed effective 1978)). Section 7 thus serves to "preserve the copyright status of the original work: Publication does not operate to prohibit other uses of the original work or to 'secure or extend copyright in such original works.'" *Id.* at 231–32, 110 S.Ct. at 1765–66.

Plaintiffs assert that section 7 applies with equal force where the underlying copyright was a common law right, citing *Jim Henson Productions v. John T. Brady & Assoc.,* 867 F.Supp. 175 (S.D.N.Y.1994), *Shoptalk, Ltd. v. Concorde–New Horizons,* 897 F.Supp. 144 (S.D.N.Y.1995), and *Cordon Art B.V. v. Jerome Walker,* 40 U.S.P.Q.2d 1506, 1996 WL 672969 (S.D.Cal.1996). The Court respectfully disagrees with these decisions.

The word "copyright" as used in section 7, the section upon which Plaintiffs' analysis of *Stewart* is premised, refers only to *statutory* copyright. The 1909 Act was very precise when it addressed common law rights, which the statute explicitly states are not to be limited or annulled. *See, e.g.,* 17 U.S.C. § 2 (repealed effective 1978) (referring to the "right[s] of the author or proprietor of an unpublished work"). Therefore, section 7 and the *Stewart* opinion must be read to refer only to a subsisting statutory copyright. Section 7 and *Stewart* should not be read to indirectly dictate that publication of a motion picture cannot constitute publication of an underlying screenplay simply because the effect of that finding would be to replace the screenplay's common law protection with statutory protection that Plaintiffs permitted to lapse through non-renewal. Had Congress wanted section 7 to apply to common

law rights, it would have stated that section 7 applied to common law rights.

There is only one sentence in *Stewart* that gives the Court pause: "The language change [in section 7 from 'copyright' to 'publication'] was suggested only to ensure that the publication of a 'new compiled work' without proper notice, *including smaller portions that had not been previously published and separately copyrighted,* would not result in those sections moving into the public domain." *Id.* at 233, 110 S.Ct. at 1766 (emphasis added) (citing Estie Stoll, Note, *Derivative Copyright and the 1909 Act—New Clarity or Confusion?,* 44 Brook. L.Rev. 905, 919–920 (1978)).

However, the Court agrees with the Nimmer treatise that this sentence should not be converted into a binding holding dictating the outcome in cases involving preexisting works that would be protected only as unpublished works. *See* Nimmer § 4.12[B] at 4–66 to 4–67. The solitary sentence in *Stewart* relating to common law rights was not the product of an in-depth analysis of congressional intent. Instead, the sentence was strictly *dictum* based on a law review article. Furthermore, the law review article that the Court cited to support the sentence quoted above, Note, 44 *Brooklyn L.Rev.,* at 919–920, goes on to posit that Congress' true intent in creating section 7 was to comply with the Constitution's mandate that copyright protection exist only for a limited duration. In order to provide for derivative work protection without running afoul of constitutional requirements, the authors of section 7:

> had to prevent forfeiture of the subsisting copyright and also prevent the new derivative copyright from working to the underlying author's advantage—and the public's disadvantage—by effectively extending the duration of the underlying work's copyright. Although section 24 set the time limit for any copyright at fifty-six years, an author conceivably could have circumvented this statutory limit by making "new versions" of his work, changing it only slightly, and then securing a copyright on each new version. The drafters of the 1909 Act considered overcoming the extension problem (ultimately met by the last provision of section 7) by actually terminating the derivative copyright on expiration of the underlying copyright.

Note, 44 *Brooklyn L.Rev.,* at 920–921. With this goal in mind, it is obvious that Congress could not have intended section 7 to apply to common law copyrights because, prior to the changes worked by the 1976 Act, an author could have maintained an indefinite monopoly by publishing a derivative work but holding on to the underlying work without separately publishing it.

A holding that permitted the owner of an "unpublished" work incorporated into a derivative work to resurrect protection for the derivative work after the derivative work entered the public domain would make the use of public domain works perilous. This peril would result because the public domain work might have been created from an underlying work still in existence but never separately published. The person seeking to use the public domain work likely would not know about and could not determine whether such a work existed. Any derivative work protected by a statutory copyright that expired due to the owner's failure to renew the copyright, any derivative work copyrighted under the 1909 Act that expired naturally, or any derivative work copyrighted under the 1909 Act or the 1976 Act that expired due to failure to comply with the requisite notice requirements could have been based on an unpublished preexisting work still in existence, which could then be used to reassert rights in the formerly public domain work.

The end result of permitting a party with a lapsed copyright to reestablish its monopoly over that work would be to inhibit the use of works by the public, a result clearly contrary to the intent of the Copyright Acts. "The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.' " *Feist Publications, Inc. v. Rural Telephone Service Co.,* 499 U.S. 340, 349, 111 S.Ct. 1282, 1290, 113 L.Ed.2d 358 (1991) (quoting U.S. Const. Art. I, § 8, cl. 8). Resurrecting lost statutory copyrights would benefit only copyright owners. Resurrection would not advance the progress of science and useful arts because authors will not become more crea-

tive or more prolific simply because they know that they need not follow the Copyright Act in order to maintain copyright protection. Moreover, many of the works that would pose a problem already exist, and thus relaxing the statutory rules would provide no incentive, but instead would be merely a windfall to the former copyright owner.

Furthermore, it is not unfair to find that a party that utilized its rights in an underlying work to create a derivative work published the underlying work to the extent that the party incorporated that work into its derivative work. The Second Circuit has noted in dicta that "once the scriptwriter obtains the economic benefit of the recording and the broadcast, he has obtained all that his common law copyright was intended to secure for him; thus, it would not be unfair to find that publication of the derivative work divested the [underlying] script of its common law protection." *Gilliam v. American Broadcasting Cos., Inc.*, 538 F.2d 14, 20 (2d Cir. 1976); *see also La Cienega Music Co. v. ZZ Top,* 53 F.3d 950, 953 (9th Cir.1994) (noting that " 'an author in permitting records of his work to be publicly marketed is certainly engaging in a form of exploitation of his work and should therefore be required to seek protection, if at all, only under the limited monopoly concept of the federal Copyright Act' ") (quoting Nimmer (1992) § 4.05[B] at 4–26). This principle is particularly compelling here, where the same entity claiming the common law rights owned the statutory copyright in the published derivative work.

Here, Batjac published McClintock! in 1963 with copyright notice. By publishing the film with notice, Batjac secured statutory copyright for all parts of the work not separately copyrighted. This protection extended to all copyrightable components of the work including the screenplays. When Batjac failed to renew the motion picture copyright in 1991, all portions of the work covered by the motion picture copyright entered the public domain. Therefore, the Register properly refused to register the screenplays for copyright.

c) *Plaintiffs were not entitled to separately register the screenplays for statutory copyright after the motion picture was published.*

Plaintiffs also contend that even if the screenplays were published with the motion picture, they remain in statutory copyright because section 7 prevents the screenplays from entering the public domain based solely on the fact that the McClintock! motion picture copyright entered the public domain. Plaintiffs admit that they would have had to renew the screenplay rights in 1991, but they contend that they were prevented from separately renewing the works by the Copyright Office's practice of not registering the constituent elements of motion pictures for separate copyright where the owner of the motion picture also owned the incorporated material and the film was exhibited without a separate copyright notice for the incorporated material.

However, as discussed above, publication of the film with copyright notice in Batjac's name secured statutory copyright for the entire picture. Therefore, Batjac had nothing to renew separately from the motion picture. Furthermore, the fact that Batjac did not renew the motion picture copyright casts serious doubt on its contention that it did not attempt to renew copyrights in the screenplays because of a practice of the Copyright Office. Moreover, under *Stewart,* the right to seek a renewal term would lie with the author's heirs, not with Plaintiffs, because Grant, the author of the screenplays, died in 1966, which was prior to the expiration of the initial copyright term.[6]

6. Plaintiffs rely on the 1963 McClintock! registration certificate as proof of their contention that they owned the underlying screenplays as works made for hire. However, the evidence in the record is more than sufficient to overcome the presumption of validity of the facts recited on the certificate. In Plaintiffs' application to register the screenplays for copyright, Plaintiffs asserted that they owned the screenplays by assignment. In addition, there are several documents in the record that describe Batjac's ownership as an assignment, including the original agreement between Batjac and Grant. (Wayne Decl., Ex. C, letter from Grant to Batjac and executed assignment agreement.) Finally, Plaintiffs' statement of uncontroverted facts and conclusions of law states that Grant "assigned the copyrights and all versions of the screenplay to Batjac." (Plaintiffs' statement of uncontroverted facts and conclusions of law ¶ 8.)

C. *UAV Infringed Plaintiffs' Copyright in the 1993 McClintock!.*

In order to establish copyright infringement, a plaintiff must establish (1) ownership of a valid copyright and (2) copying of original elements of the work. *See Feist,* 499 U.S. at 361, 111 S.Ct. at 1295–96.

1. *Plaintiffs own a valid copyright for the 1993 McClintock!.*

There is no dispute that if the 1993 copyright is valid, Plaintiffs own it. UAV, however, asserts that the copyright is not valid because the 1993 McClintock! lacks sufficient originality to qualify for copyright protection. UAV asserts that Batjac's changes—"panning and scanning" the public domain McClintock! and enhancing the film's soundtrack—are merely mechanical rather than creative alterations to the underlying work. The Court finds that the 1993 copyright is valid and encompasses both of Batjac's additions.

A certificate of copyright registration "shall constitute *prima facie* evidence of the validity of the copyright and the facts stated in the certificate." 17 U.S.C. § 410(c); *see also Apple Computer, Inc. v. Formula Intern., Inc.,* 725 F.2d 521, 523 (9th Cir.1984). The burden of proving invalidity lies with the party making the invalidity claim. *See, e.g., North Coast Indus. v. Jason Maxwell, Inc.,* 972 F.2d 1031 (9th Cir.1992); *Apple Computer,* 725 F.2d at 523. The presumption can be resolved on summary judgment. *Apple Computer, Inc. v. Microsoft Corp.,* 759 F.Supp. 1444 (N.D.Cal.1991).

■ To be copyrightable, a work must possess more than a *de minimis* degree of creativity; the work must possess "at least some minimal degree of creativity." *See Feist,* 499 U.S. at 363, 111 S.Ct. at 1296–97. The "minimal creativity" test applies to works based on derivative works. *See Peter Pan Fabrics, Inc. v. Dixon Textile Corp.,* 280 F.2d 800, 802 (2d Cir.1960). "The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Feist,* 499 U.S. at 345, 111 S.Ct. at 1287 (quoting Nimmer (1990 ed.) at § 1.08[C][1]).

Thus, the degree of originality required to create a copyrightable derivative work is low. UAV's contention that a derivative work must contain "substantial originality" in order to receive statutory copyright is simply wrong.

a) *Batjac's pan and scan format change is a copyrightable element of the 1993 McClintock!.*

■ The Court's research has found no reported decisions addressing the copyrightability of a pan and scan version of a motion picture. Examples of derivative works that courts have held to be copyrightable in other contexts include: a derivative work created by compiling multiple scenes from prior Charlie Chaplin movies, *Roy Export Co. Establishment of Vaduz, Liechtenstein, Black Inc., A.G. v. Columbia Broadcasting System, Inc.,* 503 F.Supp. 1137, 1149 (S.D.N.Y.1980); a derivative video poker game that added flashing cards, a split-screen feature, and new wagering features, *M. Kramer Mfg. v. Andrews,* 783 F.2d 421, 440 (4th Cir.1986); and a sped-up version of a video game, *Midway Mfg. Co. v. Artic Intern., Inc.,* 704 F.2d 1009, 1014 (7th Cir.1983).

In contrast are derivative works that consist of mere mechanical additions to the underlying work, which are not copyrightable, including: a smaller, plastic version of a cast iron, public domain piggy bank, *L. Batlin & Son, Inc. v. Snyder,* 536 F.2d 486, 491 (2d Cir.1976); a derivative data table where the only addition to the public domain version of the table was a change in the display of the table from vertical to horizontal, *Hengst v. Early & Daniel Co.,* 59 F.Supp. 8, 10 (1945); and works reproducing Walt Disney cartoon characters as plastic "wind-up" figures, *Durham Indus., Inc. v. Tomy Corp.,* 630 F.2d 905, 910 (2d Cir.1980).

i. *The pan and scan process can be used to create a copyrightable work.*

UAV contends that the pan and scan process is a mechanical one where the author of the pan and scan work simply follows the action in the movie, "an obvious and routine basis for scene selection [ ] entitled to no more protection than [ ] the obvious alphabetic arrangement of names in a telephone directory" that the Supreme Court held to be

noncopyrightable in Feist. (UAV's Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion.) Indeed, the Copyright Office has noted that "[t]he rule of thumb for panners and scanners is to follow the action, which simply translates into holding on whoever is speaking or following the movements of the central character." (Phares Decl., Exh. P, Register of Copyrights, *Technological Alterations to Motion Pictures* 60 (March 1989) ("Technological Alterations") (internal quotations omitted).)

On the other hand, the Copyright Office also has stated that there is "virtually an infinite number of possible" pans and scans of a film, and that the results are "virtually indistinguishable from actual camera pans." Technical Alterations 62. The Copyright Office further recognizes that "the aesthetic effect of panning and scanning" varies depending upon the manner in which the process is conducted. *Id.* According to the Motion Picture Association of America, the person panning and scanning a wide-screen motion picture "can vary the speed with which the 'camera' pans across the image ... [and] can zero in on specific features on the film image and accentuate them in the video version." *Id.* at 61.

The pan and scan process clearly has the potential to create a copyrightable derivative work and, according to Nanette Petruzzelli, Chief of the Examining Division of the Copyright Office, panned and scanned versions of prior films are accepted for copyright registration. (Supplemental Gerber Decl., Ex. B, Petruzzelli Depo. at 53–54, 94.)

ii. *Batjac's pan and scan version of McClintock! is entitled to copyright protection.*

UAV asserts that Batjac's pan and scan version of McClintock! is not copyrightable because on Batjac's copyright certificate the Copyright Office put an asterisk before the word "format" and wrote on the face of the certificate: "Format not copyrightable. Compendium II of Copyright Office Practices." The notation referred to Batjac's claim that the new material added to the underlying work to create the derivative work included "editing for new visual format," by which Batjac was referring to panning and scanning.

The format "warning" notation is made where a registration form suggests a noncopyrightable change in format. (Phares Decl., Exh. X, Petruzzelli Depo. at 18–19, 88.) For example, the "format not copyrightable" notation is used when the person seeking registration lists "editing for new visual format" as new material, but the examiner is unable to determine whether there has been a copyrightable change in the medium. (Supplemental Gerber Decl., Ex. B., Petruzzelli Depo. at 54.) Thus, in this case, the format notation means only that the examiner at the Copyright Office was unable to tell from the registration application what changes were entailed in Batjac's "editing for new visual format." The notation does not mean that a work created by the pan and scan process is not copyrightable or that Batjac's pan and scan version is not copyrightable.

UAV's evidence on summary judgment consisted primarily of declarations from two editing experts,[7] both of whom found the two works to be visually indistinguishable.[8] However, 44% of the original film was not reproduced. It is clear that the experts were looking for alterations that they, rather than copyright law, deemed significant.

Plaintiffs have produced evidence detailing the creation of the panned and scanned McClintock!, and the changes are sufficiently original to warrant protection. Michael Wayne, President and Chairman of the Board of Batjac (and son of John Wayne), created the pan and scan version by "ma[king] artistic decisions about the compo-

7. UAV's evidence consists in large part of documents produced in another case, of which UAV has requested the Court to take judicial notice. Plaintiffs assert that the documents are not admissible to support UAV's summary judgment motion because the documents consist entirely of hearsay. The Court finds it unnecessary to address this issue because even considering this evidence, UAV has failed to present sufficient evidence to prevail.

8. The only exception to the experts' conclusions was the film's credits, which Batjac changed from two columns to one column in order to fit on the smaller television screen.

sition of each frame of the 1963 picture, determining which portions should stay and which should be 'chopped off.'" (Wayne Decl. ¶ 16.) Wayne attempted to show the portions of the film "that [he] believed would be most effective for the storytelling, the characters, the interplay of characters and the quality of the 1993 VHS videocassette version of the film." (*Id.*) In addition, the Court compared the 1993 McClintock! to the public domain McClintock!, and the Court finds that Wayne's changes are sufficiently original to warrant copyright protection for the new pan and scan material. *See Past Pluto Prod. Corp. v. Dana,* 627 F.Supp. 1435, 1441 (S.D.N.Y.1986) (holding that the determination of creativity of a derivative work is judged by a "casual observer standard").

UAV has not presented evidence rebutting Batjac's factual assertions. UAV's expert opinions do not add to its position given that the experts were looking only for changes they deemed "sufficient." Accordingly, the Court finds that as a matter of law Batjac's pan and scan changes to the motion picture are copyrightable.

b) *Batjac's additions to the soundtrack of McClintock! are copyrightable.*

In addition to panning and scanning, Batjac also digitized the soundtrack of the 1963 movie, remixed it, stereoized the previously monaural sound, and upgraded the quality of the sound, all of which required a creative mixing and balancing of sounds. (Wayne Decl. 1 19; Certificate of Copyright for the 1993 McClintock!.) UAV contends that these changes, which the Copyright Office found sufficient to warrant a derivative copyright registration, are not sufficiently original under the Copyright Act. UAV contends that the sound issue should be controlled by *Hearn v. Meyer,* 664 F.Supp. 832 (S.D.N.Y.1987), in which the court held that mere artistic reproductions within the same medium were not copyrightable despite the plaintiff's expenditure of great time and effort. *See id.* at 839–40.

The reasoning of *Hearn* is not applicable to the case before the Court. The Copyright Office accepts alterations such as remixing and stereoizing as sufficiently original to constitute derivative works. (Compendium II § 496.03(b)(1); Supplemental Gerber Decl., Ex. B, Petruzzelli Depo. at 9–13 (explaining that the policy of accepting sound alterations for copyright originated in connection with sound recordings but could be applied by analogy to permit registration of derivative works based on motion picture soundtracks).) Indeed, with regard to sound recordings, the statute explicitly recognizes that a "derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed or otherwise altered in sequence or quality" is a protectable new work. 17 U.S.C. § 114(b). The Court finds that motion picture soundtracks are analogous to sound recordings and therefore alterations of motion picture soundtracks, including remixing and stereoizing, can create a separately copyrightable derivative work.

UAV presented declarations by an expert witness, an experienced editor at a postproduction video facility, who stated that he found the public domain McClintock! to be audibly indistinguishable from the 1993 McClintock!. The expert also opined that the 1993 McClintock! was not in stereo. However, the Court listened to the soundtrack of both works and found the 1993 McClintock! soundtrack to be a noticeable improvement over the public domain version. The Court also discovered that it did not need an expert to hear that the soundtrack for the 1993 McClintock! was in stereo. Accordingly, the Court finds that UAV's legal arguments and evidence are insufficient to overcome the copyright's presumption of validity,[9] and thus the sound enhancements are new material protected by copyright.[10]

9. UAV also contends that there is a genuine issue of fact as to whether Batjac owns the copyright, given that the modifications to the 1993 McClintock! were made by an independent lab, "apparently without assigning the copyright to Batjac." (UAV's Opposition to Plaintiffs' Motion and Cross-Motion at 29.) However, UAV's mere supposition, unsupported by evidence, is insufficient to rebut the presumption of validity of the certificate of copyright.

10. With regard to the changes in sound quality, one might worry that the first person to create such a derivative work would be able to monopolize the underlying public domain work by threatening any other party who, for example,

2. *UAV copied the 1993 McClintock!.*

UAV does not contest that it copied the 1993 McClintock! except for the music, which UAV exchanged for its own music. (UAV's Statement of Issues In Opposition to Plaintiffs' Motion For Summary Judgment ¶¶ 23–24.) Therefore, UAV is liable for infringing Plaintiffs' rights in the 1993 McClintock!.

3. *Plaintiffs must still prove damages.*

Derivative copyright protection only permits an infringement action for use of the elements original to the derivative work. Thus, Plaintiffs must still prove damages, and, as the Ninth Circuit has commented, given the low level of originality required for copyright protection in the context of derivative works, originality "means little more than a prohibition of actual copying." *Sid & Marty Krofft Television Prod., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1163 n. 5 (9th Cir.1977). Here, however, UAV violated that proscription.

## III. Conclusion

Based on the foregoing, the Court grants summary judgment in favor of UAV, Goodtimes, and the Register on the issue of the propriety of the Register's decision not to register the McClintock! screenplays for copyright and grants summary judgment in favor of Plaintiffs on the issue of UAV's liability for copyright infringement.

IT IS SO ORDERED.

stereoizes the public domain work, with copyright litigation. *Cf. Gracen v. Bradford Exchange*, 698 F.2d 300 (7th Cir.1983) (stating belief that a low originality requirement in the derivative work context threatened to inhibit creation of works by giving the first creator power to interfere with creation of subsequent derivative works). However, a new test for originality in the derivative work context is not necessary (nor would creation of a new test be within the power of this Court). So long as the derivative works are not copied from the original derivative work, but are created independently from the underlying work, subsequent derivative works cannot infringe the first derivative work. Nimmer § 3.03; *Tempo Music, Inc. v. Famous Music Corp.*, 838 F.Supp. 162, 170 (S.D.N.Y.1993).